**UNITED STATES, Appellee,**

v.

**Hector M. CARRILLO–FIGUEROA,
Defendant, Appellant.**

**No. 93–1555.**

United States Court of Appeals,
First Circuit.

Heard March 11, 1994.

Decided Sept. 14, 1994.

34

Gustavo Adolfo del Toro, by Appointment of the Court, for appellant.

Jeanette Mercado Ríos, Asst. U.S. Atty., with whom Guillermo Gil, U.S. Atty., and José A. Quiles Espinosa, Senior Litigation Counsel, U.S. Attorney's Office, were on brief for appellee.

Before CYR and STAHL, Circuit Judges, and PIERAS,* Senior District Judge.

PIERAS, Senior District Judge.

Defendant-appellant, Héctor M. Carrillo, appeals his conviction for robbing and placing the life of a postal inspector in jeopardy by using a dangerous weapon. Carrillo bases his appeal on two grounds. He argues that his conviction violates the Double Jeopardy Clause of the Fifth Amendment and that it resulted from the inappropriate admission of prejudicial evidence by the trial court. Carrillo also appeals the sentence imposed by the district court following his conviction. Concluding that Carrillo's conviction does not violate the Double Jeopardy Clause and that the district court committed no error in admitting evidence during the trial or in imposing the sentence, we affirm.

I.

*Factual Background*

We recount the evidence in the light most favorable to the prosecution. *United States v. Mena–Robles,* 4 F.3d 1026, 1028 (1st Cir. 1993) (citing *United States v. Alvarez,* 987 F.2d 77, 79 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 147, 126 L.Ed.2d 109 (1993)). The facts are to the effect that on July 27, 1992, at approximately 8:30 p.m., Ivette O'Neill, a United States Postal Inspector, was driving home from work in a govern-

* Of the District of Puerto Rico, sitting by designation.

ment vehicle assigned to her. Inspector O'Neill was on twenty-four hour call and carried a government issued beeper, cellular phone, and car radio. While stopped at an intersection, a man approached Inspector O'Neill, put a revolver to the left side of her head, told her that he was holding her up, and ordered her to exit the vehicle. The man then drove off with the car. As soon as he drove off, Inspector O'Neill telephoned the postal office to inform them of the robbery. She also informed the robber, via the stolen car's radio, that the vehicle he had taken was a vehicle belonging to the United States and that his action constituted a federal offense. The day after the robbery, the stolen vehicle was found in a parking lot near appellant's residence and not far from the intersection at which the robbery had taken place. The vehicle was in a disheveled, dismantled state. A bulletproof vest, a cellular telephone, a radio, a narcotics kit, and the vehicle's blue emergency revolving lights were missing from the car. The postal inspector assigned to investigate the case received information that shortly after the incident, the appellant, also known as "El Roquero," had attempted to sell a blue bulletproof vest in the neighborhood where Inspector O'Neill was robbed. It was also discovered that appellant had previously been arrested by Puerto Rico police and charged with the theft of a motor vehicle. The postal inspector obtained appellant's photograph from the Puerto Rico police department and prepared a photospread with the purpose of showing it to Inspector O'Neill. The postal inspector showed Inspector O'Neill the photospread on November 12, 1992, and she identified appellant as her assailant by picking out his photograph from among the others in the photospread.

On November 25, 1992, a Federal Grand Jury returned a true bill against the appellant. He was arraigned on December 2, 1992, and entered a plea of not guilty as to all three counts in the indictment. The three-count indictment charged appellant with unlawfully assaulting, resisting, opposing, impeding, intimidating or interfering with Postal Inspector Ivette O'Neill while she was engaged in her official duties and with the use of a revolver. The indictment further charged the appellant with the theft of the United States Postal vehicle which was within the lawful charge, custody and control of Inspector O'Neill.

A jury trial commenced on January 8, 1993. The case was submitted to the jury at around noon on January 12, 1994; however, about five hours later the jury sent a note to the judge informing him that they were unable to reach a verdict. Upon receipt of the jury's note, the judge called the jury and the parties into the courtroom. The judge then instructed the jury that they need not agree on all counts charged in the indictment and that they might wish to consider whether they agreed on one or more counts. The judge instructed the jury to go back to the jury room for further deliberation. At approximately 6:15 p.m., however, the jury sent the judge a second note informing him that they were unable to reach a verdict.[1] Before calling the jury back into the courtroom, the judge summoned counsel for the parties to ask for their suggestions on the matter. Appellant's counsel asked the court to declare a mistrial. The government opposed the request for a mistrial, and suggested instead that the jury be allowed to go home and return in the morning for further deliberations. Counsel for the government also suggested that the jury be given an "Allen" charge. The judge agreed that an "Allen" charge could prove helpful. However, when the judge called the jury and asked them whether they thought they could reach a verdict if allowed to go home and return the following morning, the foreperson responded in the negative. The rest of the jurors agreed with him by raising their hand. The judge then granted the mistrial requested by the appellant and dismissed the jury. Immediately thereafter, and before discharging counsel for the parties, the judge set a new trial for thirteen days later.

On January 20, 1993, five days before the new trial was scheduled to begin, appellant filed a motion of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Proce-

---

1. The note read: "Your honor, honestly it is impossible to reach a verdict."

dure.[2] In his motion, appellant argued that the evidence presented at trial was insufficient for a conviction and argued that a retrial was proscribed by the Fifth Amendment's Double Jeopardy Clause. In the event that the trial court decided to deny his motion, the appellant asked the court to postpone the jury trial so that he could have an opportunity to appeal the denial of his motion. The trial court did not rule on appellant's motion until the day of the commencement of the second trial. After entertaining counsel's argument on the subject out of the presence of the jury, the court made a ruling from the bench denying appellant's motion for acquittal and finding that the government had presented sufficient evidence for a conviction. The court also denied appellant's request for a continuance of the trial. The trial commenced as scheduled on January 25, 1993, and lasted three days. On the second day of trial, at the conclusion of the government's case, the appellant made a new motion for judgment of acquittal which the court denied. The case was submitted to the jury on the third day of trial. The jury delivered its verdict on the same day finding the appellant not guilty on counts one and two of the indictment, but guilty on count three. After asking for an extension, which the court granted, the appellant filed a final motion for judgment of acquittal on February 22, 1993. The court denied appellant's motion on April 16, 1993.

On May 14, 1993, the court sentenced the appellant to a term of imprisonment of 121 months and a term of supervised release of five years. This appeal was timely filed on May 20, 1993.

## II.

### Discussion

### A. The Double Jeopardy Claim

Appellant assigns error to the trial court's denial of his motion for judgment of acquittal filed after the first jury had been discharged, but before the commencement of the second trial.[3] Appellant does not ask us to review the correctness of the trial court's decision to deny his motion of acquittal, but instead asks us to vacate his conviction as he alleges that his second trial violated the Double Jeopardy Clause of the Fifth Amendment. Appellant argues that the second trial put him in double jeopardy because he was entitled to a judgment of acquittal at the end of the first trial. Pitching his argument on *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), he argues that the trial court's failure to recognize the insufficiency of the evidence presented against him in the first trial and to provide him with an opportunity to appeal the court's denial allowed the government to "take two bites out of the apple" and obtain a conviction against him which it could not have obtained at the first trial.

In essence, appellant argues that the Double Jeopardy Clause precluded his second trial due to the fact that the government failed to present enough evidence to convict

---

**2.** Rule 29(c) of the Federal Rules of Criminal Procedure provides as follows:

> If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

Appellant filed his motion eight days after the jury was discharged; however, his motion was timely as the 7-day period began to run on January 13 and intermediate weekends are ex-

cluded from the computation of a seven-day period. *See United States v. Castro–Lara*, 970 F.2d 976 (1st Cir.1992), *cert. denied, Sarraff v. United States*, —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993).

**3.** Appellant made six motions for judgment of acquittal. He made his first one on January 11, 1993, at the conclusion of the government's case in the first trial; his second one on January 12, 1993, at the conclusion of the defense's case in the first trial; his third one on January 29, 1993, after the discharge of the jury in the first trial; his fourth one on January 26, 1993, at the conclusion of the government's case in the second trial; his fifth one on January 27, 1993, at the conclusion of the defense's case; and, his sixth one on February 22, 1993, after the discharge of the jury in the second trial.

during the first trial. Specifically, appellant asserts that under *Burks* he was entitled to have a reviewing court examine the trial court's denial of his motion of acquittal for insufficiency of the evidence. The petitioner in *Burks* had claimed insanity as a defense to a bank robbery count at trial, but was nevertheless convicted by the jury after the trial court denied his motion for a judgment of acquittal. Burks appealed his conviction arguing that the trial court had erred in denying his motion for judgment of acquittal. The Court of Appeals for the Sixth Circuit, holding that the prosecution had failed to present sufficient evidence to rebut petitioner's proof as to insanity, reversed and remanded the case to the trial court with directions to determine whether judgment of acquittal should be entered or a new trial ordered. The Supreme Court granted certiorari and held that double jeopardy had attached at the moment that the court of appeals determined that the prosecution had not presented sufficient evidence to convict at the first trial and that, therefore, the court of appeals should have entered or ordered a judgment of acquittal.

■ A defendant in a criminal proceeding is protected by the Double Jeopardy Clause against multiple punishments and repeated prosecutions for the same offense. *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (citing *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975)); *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

However, the Double Jeopardy Clause is not an absolute bar to successive trials. *Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984). "The protection embodied in the Double Jeopardy Clause is a personal defense that may be waived or foreclosed by a defendant's voluntary actions or choices, including a request for or effectual consent to a mistrial." *United States v. Aguilar-Aranceta,* 957 F.2d 18, 21 (1st Cir.), *cert. denied, Aguilar-Aranceta v. United States,* —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992) (citing *United States v. Dipietro,* 936 F.2d 6, 9 (1st Cir.1991)). If a mistrial is declared at the request of the defendant, the defendant is deemed to have waived any double jeopardy claim he might otherwise have. *Id.*

■ . The appellant moved for a mistrial after the jurors informed the trial court for the second time that they were unable to reach a verdict. During oral argument before us, the appellant argued that he had no choice but to consent to the declaration of a mistrial. The record, however, does not reveal a grudging consent by the appellant. On the contrary, the record shows that the appellant asked for a mistrial almost immediately after the court elicited suggestions from counsel on how to respond to the jury's second note informing the court of their inability to reach a verdict.[4] Before granting appellant's motion for a mistrial, the court advised the appellant that the case would have to be retried. Appellant's counsel confirmed his understanding of this fact by stat-

---

4. The exchange between the court and the parties was, in relevant part, as follows:

> THE COURT: Okay. Good evening. It's fifteen after six and I have a message from the jury that it reads: "Your Honor, honestly, it is impossible to reach a verdict." Very well. Let's hear suggestions from counsel.
> [PROSECUTOR]: Your Honor, they may just be very exhausted, and I would suggest to the Court to just let them rest this evening and have them return tomorrow morning to continue deliberation. They have not been deliberating that long considering that the trial did begin on Friday.
> THE COURT: Well, the case was submitted about twelve noon.
> [PROSECUTOR]: That is correct, your Honor.
> [DEFENSE COUNSEL]: Your honor, this is a very short case. They have been deliberating

> more and they have taken longer than has taken the testimony of the witnesses. More than six hours they have been deliberating. I believe it is impossible to reach an agreement. I believe the jury should be excused and a hung jury—no verdict be entered, your Honor, because honestly this case started at noon during the afternoon on Friday with only one testimony, after 2:00 o'clock because you were attending a TRO in another case. For less than two hours the witness where testifying. All in all he—in the whole case it hasn't taken six hours complete of testimony for the jury. They—said it is impossible to reach an agreement. No, the case is very short. I think that the jury should be dismissed, your Honor, very honestly.

ing: "I know that, your Honor. I know that we have to start again, yes, your Honor". Thus, the record reflects not only that the appellant *requested* the mistrial but that he expressly consented to a new trial. The double jeopardy claim was waived.

■ Even if the double jeopardy claim had been preserved, it could not have succeeded. A retrial following a "hung jury" does not violate the Double Jeopardy Clause. *Richardson v. United States*, 468 U.S. 317, 324, 104 S.Ct. 3081, 3085, 82 L.Ed.2d 242 (1984) (citing to *Logan v. United States*, 144 U.S. 263, 297–98, 12 S.Ct. 617, 627–28, 36 L.Ed. 429 (1892)).

### B. *Jury Access to the Photospread*

Appellant argues that the trial court improperly permitted jury access, during deliberations, to a photospread which included a "mugshot" taken of appellant in connection with a previous arrest. The photospread had been admitted into evidence over appellant's objection. The photospread consisted of black and white photographs of six males including the appellant. The photographs had been sandwiched between cardboard paper so that only the faces were visible. The photographs were stapled together so that the six faces were arranged in a circle. It was the same photospread shown to Inspector O'Neill on November 12, 1992, when she first identified the appellant as her assailant. The government offered it into evidence to buttress Inspector O'Neill's identification, which was heatedly contested at both trials.

■ Appellant claims that the trial court committed reversible error by allowing the jurors to take the photospread with them during their deliberations. Allowing the jurors to take the photospread was tantamount, the appellant argues, to the impermissible admission into evidence of "other

acts" evidence contrary to Rule 404(b) of the Federal Rules of Evidence. The appellant essentially speculates that the jury could have gleaned that his photograph was a "mugshot," from which it might have inferred that he had a prior criminal record. Aside from its speculative nature, appellant's contention is precluded by his failure to see to it that the photospread was made part of the appellate record. Effective appellate review is impossible without it. Second, appellant failed to raise the present claim in the district court. We will not consider arguments never presented to the trial court. *United States v. Lebon*, 4 F.3d 1, 2 (1st Cir.1993).[5] Finally, during closing argument, appellant's counsel invited the jury to view appellant's photograph in the photospread and compare it to a written statement made by Inspector O'Neill. In so doing, appellant sought to emphasize the alleged discrepancies between Inspector O'Neill's written description of her assailant and appellant's photograph in the photospread. Thus, in myriad ways, appellant waived any claim that the jury was improperly allowed access to the photospread during its deliberations.

■ We do not read appellant's claim as a challenge to the admission of the photospread into evidence. However, even if it were read to encompass such an indirect challenge, we would not find reversible error. In objecting at trial, the appellant did not rely on Rule 404(b). Indeed, he failed to state a basis for the objection. Unless the basis for objection is apparent from the context, the grounds for objection must be specific so that the trial court may have an opportunity to address the claim later sought to be presented on appeal. *United States v. Figueroa*, 976 F.2d 1446, 1453 (1st Cir.1992), *cert. denied, Figueroa v. United States*, —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993) (citing Fed.R.Evid. 103(a)(1)).[6] Be-

---

5. Although appellant objected to the admission of the photospread into evidence, the court overruled the objection. Jurors generally are entitled to examine exhibits properly admitted into evidence. *United States v. De Coito*, 764 F.2d 690, 695 (9th Cir.1985); *see also United States v. Jackson*, 477 F.2d 879, 880 (8th Cir.1973); *Dallago v. United States*, 427 F.2d 546, 553 (D.C.Cir. 1969). Appellant did not object to the photospread going to the jury room.

6. Rule 103 of the Federal Rules of Evidence provides,

(a) **Effect of erroneous ruling.**
 Error may not predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and,
(1) **Objection**
 In case the ruling is one admitting evidence, *a timely objection or motion to strike appears of*

fore objecting to the admission of the photospread, the appellant conducted a *voir dire* examination of Inspector O'Neill pertaining to the photospread. However, nothing in appellant's line of questioning indicated a concern that the admission of the photospread was equivalent to introducing "prior bad acts" evidence. Rather, the *voir dire* examination was aimed at establishing that Inspector O'Neill could not have made an adequate identification of her assailant in the first instance because the photographs were not in color and the visible portions of the photographs were too small. The *voir dire* examination established that Inspector O'Neill was not able to ascertain her assailant's height, skin tone, eye color, or hair color from the photographs included in the photospread. At the conclusion of the *voir dire* examination, the court asked appellant whether he objected. Appellant responded in the affirmative without elaboration, and the court overruled the objection.

Thus, since appellant failed to state a specific objection based on Rule 404(b), and no such basis of objection could be considered clear from the context, the trial court was given no opportunity to address any concerns the appellant might have had regarding unfair prejudice resulting from the admission of the photospread into evidence. Consequently, even if appellant's present claim were construed as an indirect attack on the trial court's evidentiary ruling, we would review it only for plain error. *United States v. Castiello,* 915 F.2d 1, 4 (1st Cir.1990); *see* Fed. R.Evid. 103(d) ("Nothing in [Rule 103] precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the Court").

■ We have explained in general terms that

> The admissibility of "other acts" evidence depends on a two-part analysis. First, "other acts" evidence must be excluded if it is relevant *only* because it shows bad character (*i.e.* the proposed logical inference includes character as a *necessary* link.)" *United States v. Ferrer–Cruz,* 899 F.2d 135, 137 (1st Cir.1990) (emphasis in original). Second, the district court must weigh the probative value of the "other acts" evidence against any unfair prejudice to the defendant; and it is only when the risk of unfair prejudice "substantially" outweighs its probative value that the evidence is to be excluded.

*United States v. Figueroa,* 976 F.2d at 1453 (quoting *United States v. Shenker,* 933 F.2d 61, 63 (1st Cir.1991)). However, because there is grave risk of prejudice in the introduction of photographs such as "mugshots", we have adopted a three factor analysis specifically tailored to determining their admissibility. *See United States v. Cannon,* 903 F.2d 849, 855 (1st Cir.), *cert. denied, Cannon v. United States,* 498 U.S. 1014, 111 S.Ct. 584, 112 L.Ed.2d 589 (1990). These factors, adopted by us in *United States v. Fosher,* 568 F.2d 207, 215 (1st Cir.1978), are:

> 1. The government must have a demonstrable need to introduce the photograph;
>
> 2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
>
> 3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photograph.

*Id.* Thus, in reviewing a trial court's admission of "mugshots", we examine not only what was submitted, but why and how. *Cannon,* 903 F.2d at 855.

In *Cannon,* we applied the preceding analysis and upheld the admission of a group of photographs which included a "mugshot" of the defendant: The defendant had been convicted of one count of armed bank robbery and appealed his conviction claiming that the admission of the photographs was unduly prejudicial and an abuse of discretion by the trial court. The photo array in *Cannon* consisted of individual, front-view, head-and-shoulder shots of six young, white men. *Id.* (emphasis added).

*record, stating the specific ground or objection, if the specific ground was not apparent from the context; ...*

We found that the admission of the group of photographs was not an abuse of discretion.[7]

■■■ An application of the three factor *Fosher* test in this case establishes that admission of the photospread into evidence did not constitute plain error. The government's chief identification witness at trial was Inspector O'Neill, whose identification of appellant had been heatedly contested at the first trial. Thus, the government introduced the photospread to strengthen Inspector O'Neill's identification testimony. As expected, the defense did indeed mount an effective attack against Inspector O'Neill's identification testimony, which weakened a key link in the government's case.[8] Thus, the government had a demonstrable need for the challenged photospread, as support for its critical identification evidence.

Second, the photospread did not imply that appellant had a prior criminal record. Like the photographs introduced in *Cannon,* the photospread contained front-view photographs only. Moreover, only the face of each individual was visible, as cardboard had been used to redact both sides of the photographs. No photographic backdrops were visible. There were no profile shots, no number markings, and no height bars. Like the photographs in *Cannon,* the photographs included in the photospread in this case possessed no characteristics identifying them as police "mugshots."

Third, the manner in which the photospread was introduced at trial drew no particular attention to the source or the implications of the photographs. Indeed, government counsel and Inspector O'Neill said nothing about the source of the photographs or their implications.

As the photospread was properly admitted in evidence, the jury was entitled to examine and consider it. We find no error, plain or otherwise.

## C. *The Sentencing Enhancements*

At sentencing, the district court increased appellant's base offense level ("BOL") of 20 by six levels for the use of a firearm as charged in count three,[9] *see* U.S.S.G. § 2B3.1; by three levels due to the fact that the victim was a "law enforcement officer," *see id.* § 3A1.2(b); and finally by one level because the loss sustained as a result of the robbery exceeded $10,000.00, *see id.* § 2B3.1(b)(6)(A). Combined with a criminal history category of I, the total offense level of 30 resulted in a guideline sentencing range ("GSR") of 97 to 121 months. The sentencing court imposed a sentence of 121 months.

■■■ We review interpretations of the Sentencing Guidelines *de novo. United States v. Skrodzki,* 9 F.3d 198 (1st Cir.1993) (citing *United States v. Mullins,* 992 F.2d 1472, 1478–79 (9th Cir.), *cert. denied, Winkle-*

7. We undertook "abuse of discretion" review in *Cannon* because the defendant had interposed a specific Rule 404(b) objection.

8. The defense first attacked Inspector O'Neill's identification during direct examination by conducting a *voir dire* examination, aimed at establishing that O'Neill could not have made a reliable identification of her assailant from the photospread. Later, the defense attacked Inspector O'Neill's identification on cross-examination and during its direct examination of Modesto Estrada, a police officer who prepared a statement in response to the complaint filed by Inspector O'Neill with the Puerto Rico Police Department. The defense highlighted details of Inspector O'Neill's identification testimony at the second trial which differed from her testimony at the first trial and from descriptions she had given previously to the postal inspector and to Officer Estrada. The most significant differences related to the color of the assailant's eyes and skin. Finally, the defense obtained admissions from

O'Neill that during the first trial she had testified that the lights at the intersection where she had been robbed were "not bright," whereas at the second trial she stated that there were bright "anti-crime" lights at the intersection.

9. Count three charged that:

> [T]he defendant herein did knowingly, willfully, intentionally, and unlawfully rob Postal Inspector Ivette O'Neill, a person having lawful charge, custody and control of an official United States Postal vehicle, to wit: a 1989 gold Honda Accord, registration tag number AWX–038, United States Postal service vehicle number 9911443 and in so doing, the defendant, HECTOR MANUEL CARRILLO, also known as "El Roquero," did put the life of Postal Inspector Ivette O'Neill in jeopardy by the use of a dangerous weapon, to wit: a stainless steel revolver with a barrel approximately two (2) inches long, all in violation of title 18, United States, section 2114.

*man v. United States,* — U.S. —, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993). After determining the Guideline's meaning and scope, we review the sentencing court's factual findings for clear error. *Id.*

■ Appellant argues that the enhancement for using a firearm is inappropriate because the firearm for which he received a six level enhancement is the same firearm referred to in count two of the indictment.[10] He contends, without argument or citation to authority, that since the jury acquitted him on count two the sentencing court could not take the firearm into account for calculating his sentence on count three. We find nothing inappropriate in the enhancement.

The Guidelines specifically provide that an enhancement is to be applied when a firearm is used during the commission of a robbery. The fact that the jury found the appellant not guilty on count two of the indictment is irrelevant to the sentencing enhancement applied under count three, because count three specifically charged appellant with conduct which included "[the] use of a dangerous weapon, to wit: a stainless steel revolver with a barrel approximately two (2) inches long." Accordingly, appellant's argument that the six level enhancement is based on conduct of which he was acquitted mischaracterizes the basis for the enhancement applied by the sentencing court.

Thus, we need go no further. Since the conduct pursuant to which the enhancement was applied formed part of count three as alleged, and since appellant was convicted on count three, we believe that the district court correctly imposed the six level enhancement for use of a firearm, *see* U.S.S.G. § 2B3.1(b)(2)(B), and that the resulting ten-year and one-month Guideline sentence was proper and well within the twenty-five year maximum permitted under 18 U.S.C. § 2114.

■ Next, the appellant argues that the three level enhancement imposed because Inspector O'Neill was a law enforcement officer constituted error since the base offense level for robbery contains an inherent enhancement which already takes account of O'Neill's status as a postal employee. The court applied the enhancement pursuant to Guideline Section 3A1.2.(b) which provides:

[If] during the course of the offense or immediate flight therefrom, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury, increase [the base offense level] by 3 levels.

Note 5 of the Commentary Notes to Section 3A1.2 provides:

Subdivision (b) applies in circumstances tantamount to aggravated assault against a law enforcement or corrections officer, committed in the course of or in immediate flight following, another offense, such as bank robbery. While this subdivision may apply in connection with a variety of offenses that are not by nature targeted against official victims, its applicability is limited to assaultive conduct against law enforcement or corrections officers that is sufficiently serious to create at least a "substantial risk of serious bodily injury" and that is proximate in time to the commission of the offense.

At the sentencing hearing, the court ruled that the enhancement applied because the defendant had to be aware that Inspector O'Neill was a law enforcement officer as the vehicle that she was driving exhibited characteristics identifying it as an official vehicle.

10. Count two of the indictment reads,

[T]he defendant herein, did knowingly use and carry a firearm of the following description: a stainless steel revolver with a barrel approximately two (2) inches long, during and in relation to a crime of violence in violation of Title 18, United States Code, Section 111, as defined in Title 18, United States Code, 924(c)(1) and (3), which may be prosecuted in a Court of the

United States, to wit: assaulting, resisting, opposing, impeding, intimidating or interfering, with Postal Inspector Ivette O'Neill, an officer designated in Title 18, United States Code, Section 1114, while engaged in the performance of her official duties. All in violation of Title 18, United States Code, Section 924(c)(1) and (3).

Appellant contends that Note 4 of the Commentary to Section 3A1.2 *precludes* the enhancement:

> "Motivated by such status" in subdivision (a) means that the offense of conviction was motivated by the fact that the victim was a government officer and employee, or a member of the immediate family thereof. This adjustment would not apply, where both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute. This adjustment would also not apply in the case of a robbery of a postal employee because the offense guideline for robbery contains an enhancement (§ 2B3.1(a)) that takes such conduct into account.

Appellant argues that Inspector O'Neill is a postal employee and that therefore the three level enhancement should not have been applied. Appellant's reliance on Note Four is misplaced. Note Four governs when the three level enhancement is applied pursuant to section 3A1.2(a), *not* section 3A1.2(b). The sentencing court enhanced the BOL by three levels because Inspector O'Neill is a law enforcement officer, not because she was a postal employee. To be sure, Note Four makes clear that a three level enhancement cannot be applied pursuant to U.S.S.G. 3A1.2(a) if the offense of conviction was motivated by the fact that the victim was a postal employee. However, the sentencing court applied the enhancement because it found that the appellant had reasonable cause to believe that Inspector O'Neill was a law enforcement officer. Therefore, we find that the court properly enhanced the BOL by three levels pursuant to § 3A1.2(b).

 Appellant's final assignment of error involves the one level enhancement imposed pursuant to U.S.S.G. § 2B3.1(b)(6)(A) because the court calculated the loss [11] suffered as a result of the robbery at more than $10,000.00. The court found that the property at issue here—a 1989 Honda Accord, a bulletproof vest, a cellular telephone, a radio, a radio converter, and the vehicle's blue emergency revolving lights—had a total market value of $14,635.00. Section 2B3.1(b)(6)(A) provides that if the loss suffered as a result of a robbery exceeds $10,000.00, the BOL should be increased by one level. Appellant's contentions on appeal, generously construed, are that the sentencing court erred in finding that the loss in this case was more than $10,000.00 because (1) the court did not use an appraisal of the vehicle in making its finding; (2) the court did not use the "black book" to establish the vehicle's fair market value; (3) the fair market value of the vehicle at the time of the sentencing was less than $10,000.00 because as a government vehicle it is tax exempt; and (4) the sum of the vehicle's correct fair market value and the value of the other items missing from the car do not exceed $10,000.00.

 Ordinarily, when property is taken, the amount of the loss is calculated by using the fair market value of the particular property at issue. U.S.S.G. § 2B1.1; App. Note 2. The amount of loss in the case of a vehicle is calculated using the market value of the vehicle even if the vehicle is recovered immediately. *Id.* "The loss need not be determined with precision, and may be inferred from any reasonably reliable information available, including the scope of the operation." U.S.S.G. § 2B1.1; App. Note 3. A defendant bears a heavy burden of demonstrating that the district court's finding on value is clearly erroneous. *Skrodzki*, 9 F.3d at 203.

A sentencing court may base its finding on any reasonably reliable information available. In finding that the market value of the items at issue here exceeded the sum of $10,000.00, the court credited information in the presentence report, as well as the hearsay testimony of the probation officer at the sentencing hearing that postal agent J.J. Rodríguez had stated that the fair market value of the vehicle was $11,000.00; its cost to the government, $8,750.00; the value of the bulletproof vest, $350.00; the cellular telephone, $850.00; the radio, $1,700.00; the radio converter, $700.00; and emergency lights, $35.00. Appellant presented no evidence to rebut the probation officer's testimony. Appellant ad-

---

11. "Loss" means the value of the property taken. U.S.S.G. § 2B1.1; App. Note 2.

vanced no ground for considering the testimony of the probation officer unreliable and the sentencing court credited it as having sufficient indicia of reliability. Finally, the *value* of government vehicles is not affected by their tax exempt status. The sentencing court's findings were not clearly erroneous. For the reasons set forth above, we find that the sentencing court did not commit error in imposing appellant's sentence.

### III.

### CONCLUSION

For the foregoing reasons, appellant's conviction and sentence are ***affirmed.***